**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| STEFANIA MAURIZI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 20-0966 (EGS) |
| v. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| U.S. DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

BACKGROUND AND PROCEDURAL HISTORY ............................................. 2

    A.    Julian Assange and WikiLeaks ............................................................ 2

    B.    Plaintiff and Her Reporting on Julian Assange and WikiLeaks ........... 5

    C.    Plaintiff's FOIA Request and State Records Productions ..................... 6

STANDARD OF REVIEW ................................................................................. 8

ARGUMENT ....................................................................................................... 10

    I.    STATE HAS NOT AND CANNOT SHOW THAT THE INFORMATION WITHHELD IS PROPERLY EXEMPT FROM DISCLOSURE UNDER EXEMPTION 5 ........................................... 10

        A.    State Has Not Shown, and Cannot Show, that All the Withheld Information Is Predecisional and Deliberative. ...................... 10

        B.    State Has Not and Cannot Articulate a Reasonably Foreseeable Harm to Interests Protected by Exemption 5. ........................... 13

            1.    Discussions of News Articles, Press Inquiries, and Public-Facing Talking Points Are Particularly Unlikely to Present a Foreseeable Harm if Disclosed ................................. 14

        C.    Foreseeable Harm Is Not Apparent from Other Withheld and Over-Redacted Records........................................................... 18

    II.    STATE HAS NOT, AND CANNOT, MEET ITS BURDEN OF SHOWING THAT THE NAMES OF PUBLIC SERVANTS ARE "PRIVATE" PURSUANT TO EXEMPTION 6................................... 20

CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Immigr. Lawyers Ass'n v. Exec. Off. For Immigr. Review*,
  830 F.3d 667 (D.C. Cir. 2016) ........................................................................20

*Arthur Andersen & Co. v. IRS*,
  679 F.2d 254 (D.C. Cir. 1982) .........................................................................11

*Bartholdi Cable Co. v. FCC*,
  114 F.3d 274 (D.C. Cir. 1997) .........................................................................21

*Bartko v. DOJ*,
  898 F. 3d 51 (D.C. Cir. 2018) ...........................................................................8

*Calderon v. USDA*,
  236 F. Supp. 3d 96 (D.D.C. 2017) ...................................................................21

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980), and (2) ..............................................10, 11, 13

*COMPTEL v. FCC*,
  910 F. Supp. 2d 100 (D.D.C. 2012) .................................................................21

*CREW v. FEC*,
  711 F.3d 180 (D.C. Cir. 2013) ...........................................................................8

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
  436 F. Supp. 3d 90 (D.D.C. 2019) ...................................................................14

*DOD v. FLRA*,
  510 U.S. 487 (1994) ..........................................................................................21

*DOI v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ........................................................................................8, 10

*Elec. Privacy Info. Ctr. v. DOJ*,
  416 F. Supp. 2d 30 (D.D.C. 2006) .....................................................................8

*Fox News Network, LLC v. Dep't of Treasury*,
  739 F. Supp. 2d 515 (S.D.N.Y. 2010) .............................................................16

*Friedman v. United States Secret Serv.*,
  923 F. Supp. 2d 262 (D.D.C. 2013) .................................................................21

*FTC v. Grolier, Inc.*,
    462 U.S. 19 (1983) ..................................................................................................10

*In Def. of Animals v. NIH*,
    543 F. Supp. 2d 83 (D.D.C. 2008) ...........................................................................8

*Judicial Watch, Inc. v. Dep't of Commerce*,
    375 F. Supp. 3d 93 (D.D.C. 2019) .............................................................13, 14, 22

*Judicial Watch, Inc. v. Dep't of State*,
    349 F. Supp. 3d 1 (D.D.C. 2018) ...........................................................................11

*Judicial Watch, Inc. v. Dep't of the Treasury*,
    802 F. Supp. 2d 185 (D.D.C. 2011) .......................................................................12

*Judicial Watch, Inc. v. DOJ*,
    20 F.4th 49 (D.C. Cir. 2021) ..................................................................................11

*Judicial Watch, Inc. v. DOJ*,
    No. 17-0832 (CKK), 2019 U.S. Dist. LEXIS 163473 (D.D.C. Sept. 24, 2019) .......................9

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ............................................................................9, 13

*Louise Trauma Ctr. LLC v. Dep't of Homeland Sec.*,
    No. 1:20-cv-01128 (TNM), 2022 U.S. Dist. LEXIS 66691 (D.D.C. Apr. 11,
    2022) ......................................................................................................................22

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) ...............................................................................8

*Multi AG Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008) .............................................................................20

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ..................................................................................................8

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002) .................................................................................20

*New York Times Co. v. DOJ*,
    19 Civ. 1424 (KPF), 2021 U.S. Dist. LEXIS 20776 (S.D.N.Y. Feb. 3, 2021) .................19, 20

*Payne Enters. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) .................................................................................8

*Petroleum Info. Corp. v. DOI*,
    976 F.2d 1429 (1992) ..............................................................................................16

*Pinson v. DOJ*,
   236 F. Supp. 3d 338 (D.D.C. 2017) ....................................................................9

*Playboy Enters. Inc. v. DOJ*,
   677 F.2d 931 (D.C. Cir. 1982) ........................................................................11

*Reporters Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (D.C. Cir. 2021) ..................................................................... *passim*

*Reporters Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,
   No. 1:18-cv-00155 (TNM), 2021 U.S. Dist. LEXIS 200240 (D.D.C. Oct. 18,
   2021) ...............................................................................................................14

*Rosenberg v. DOD*,
   442 F. Supp. 3d 240 (D.D.C. 2020) .....................................................15, 16, 18

*Russell v. Dep't of Air Force*,
   682 F.2d 1045 (D.C. Cir. 1982) .................................................................10, 11

*Seavey v. DOJ*,
   266 F. Supp. 3d 241 (D.D.C. 2017) ....................................................................8

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984) ...........................................................................21

*Wolfe v. Dep't of Health & Human Servs.*,
   839 F.2d 768 (D.C. Cir. 1988) ..........................................................................11

**Statutes**

FOIA Improvement Act ............................................................................9, 13, 15, 17

Freedom of Info. Act, 5 U.S.C. § 552 *et seq* ....................................................... *passim*

**Other Authorities**

162 Cong. Rec. H3714-01 (2016) ..........................................................................13, 14

Attorney General Reno's FOIA Memorandum, FOIA Update Vol. XIV, No. 3
   (1993) ...............................................................................................................15

Local Civ. Rule 7(h)(2) ................................................................................................2

Office of Information Policy, U.S. Dep't of Justice, FOIA Update: OIP Guidance:
   Applying the 'Foreseeable Harm' Standard Under Exemption 5, FOIA Update
   Vol. XV, No. 2 (1994) ................................................................................15, 17

Office of Information Policy, U.S. Dep't of Justice, FOIA Update: Policy
    Guidance: When to Assert the Deliberative Process Privilege Under FOIA
    Exemption Five, FOIA Update, Vol I, No. 1 (1979) ........................................................16, 17

S. Rep. No. 114-4 (2015) ...................................................................................................9, 15, 17

Plaintiff Stefania Maurizi ("Maurizi"), through counsel, hereby moves this Court for

partial summary judgment regarding the Defendant United States Department of State's ("State")

redactions and withholdings under Freedom of Information Act ("FOIA") Exemptions 5 and 6.

## INTRODUCTION

This lawsuit arises from Plaintiff Stefania Maurizi's public records request directed to the

U.S. Department of State ("State") for records concerning Julian Assange from 2010 to 2012,

during which time Assange became a household name for his publication of troves of

government records shedding light on U.S. activities in Afghanistan and Iraq.  Following

Assange's publication of these documents, he spent the majority of the past decade at the

Ecuadorian Embassy in London, where he was granted asylum.  Assange, his release of

nonpublic government records and the U.S. investigation of Assange are of great public interest

now, as the U.S. seeks to extradite and prosecute Assange in connection with the 2010 document

leaks.

Maurizi's public records request seeks records that are, for the most part, more than a

decade old and reflect State communications concerning public reaction to the 2010 leaks.  Most

of the names on emails have been redacted on Exemption 6 grounds, which applies to "personnel

and medical files and similar files" where their disclosure "would constitute a clearly

unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  State employee names do not

categorically fall under this exemption.  Additionally, many of the produced communications are

heavily redacted on Exemption 5 grounds, which permits the government to withhold

information that is covered by the deliberative process privilege.  For both of these discretionary

exemptions, State must show "it is reasonably foreseeable that release of those materials would

cause harm to an interest protected by that privilege." *Reporters Comm. for Freedom of the*

*Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021).  State cannot demonstrate that these exemptions

1

apply to all its extensive withholdings, or that there is a foreseeable harm if these records were released.

## BACKGROUND AND PROCEDURAL HISTORY[1]

### A.    Julian Assange and WikiLeaks

WikiLeaks is an online media organization that specializes in publishing "censored or otherwise restricted official materials involving war, spying and corruption." *What is WikiLeaks*, WikiLeaks (Nov. 3, 2015), https://wikileaks.org/What-is-WikiLeaks.html. It has published millions of such documents from governments all over the world since Assange founded it in 2006. *Id.*

WikiLeaks initially grabbed the public and the government's attention in 2010, when it released a series of confidential U.S. military and diplomatic records revealing previously unknown U.S. military activities in the Afghanistan and Iraq wars:

- In April 2010, WikiLeaks released a video entitled "Collateral Murder," which documented a 2007 attack by U.S. forces in Baghdad that killed a dozen people, including two Reuters news staff. *Collateral Murder*, WikiLeaks (Apr. 5, 2010), https://collateralmurder.wikileaks.org/. The news organization Reuters had long sought the release of the footage, but its Freedom of Information Act request for copies, which had been pending for nearly three years at the time, had not been processed. Dean Yates, *Return to Ward 17: Making Peace with Lost Comrades*, Reuters Investigates (Apr. 18, 2018), https://www.reuters.com/investigates/special-report/witness-yates-injury/. Wikileaks' release received substantial news coverage, and in response, the government provided more detail on its investigation into the incident. *See, e.g.*, CNN Wire Staff, *Video Shows deaths of two Reuters journalists in Iraq in 2007*, CNN (Apr. 6, 2010), http://www.cnn.com/2010/WORLD/meast/04/05/iraq.photographers.killed/index.html; Elisabeth Bumiller, *Video Shows U.S. Killing of Reuters Employees*, N.Y. Times (Apr. 5, 2010), https://www.nytimes.com/2010/04/06/world/middleeast/06baghdad.html.

---

[1] This Motion seeks judicial review of State's administrative record related to Plaintiff's FOIA request and therefore a Statement of Undisputed Material Facts is not required. *See* Local Civ. Rule 7(h)(2).

- That July, WikiLeaks published a cache of documents it referred to as the "Afghan War Diary," consisting of field reports by U.S. soldiers and intelligence officers from the Afghanistan War. *Afghan War Diary, 2004-2010*, WikiLeaks (July 25, 2010), https://www.wikileaks.org/wiki/Afghan_War_Diary,_2004-2010. The release again drew substantial media coverage, which focused on new details that the reports provided about the war. *See* C.J. Chivers et. al,, *View Is Bleaker Than Official Portrayal of War in Afghanistan*, N.Y. Times (July 25, 2010), https://www.nytimes.com/2010/07/26/world/asia/26warlogs.html; Nick Davies & David Leigh, *Afghanistan war logs: Massive leak of secret files exposes truth of occupation*, The Guardian (July 25, 2010), https://www.theguardian.com/world/2010/jul/25/afghanistan-war-logs-military-leaks. In response to the release, the Obama administration emphasized that it had implemented policy changes to address the issues highlighted in the documents. *See* Mike Allen, *W.H. condemns 'irresponsible' leaks*, Politico (July 25, 2010), https://www.politico.com/story/2010/07/wh-condemns-irresponsible-leaks-040204.

- In late 2010, WikiLeaks released a similar cache of documents related to U.S. military involvement in Iraq and dubbed "The Iraq War Logs," *see* WikiLeaks (Oct. 22, 2010), https://wikileaks.org/irq/, as well as diplomatic cables it had obtained from State, which it referred to as "Cablegate." *See WikiLeaks Statement on the 9 Month Anniversary of Cablegate: Release of 133,887 Cables*, WikiLeaks (Aug. 29, 2011), https://wikileaks.org/Wikileaks-Statement-on-the-9-Month.html. These releases also garnered substantial public interest and news coverage. *See, e.g.*, *WikiLeaks: Iraq war logs 'reveal truth about conflict'*, BBC News (Oct. 23, 2010), https://www.bbc.com/news/world-middle-east-11612731; Nick Davies et. al, *Iraq war logs: secret files show how U.S. ignored torture*, The Guardian (Oct. 22, 2010), https://www.theguardian.com/world/2010/oct/22/iraq-war-logs-military-leaks; Scott Shane & Andrew W. Lehren, *Leaked Cables Offer Raw Look at U.S. Diplomacy*, N.Y. Times (Nov. 28, 2010), https://www.nytimes.com/2010/11/29/world/29cables.html. In addition to informing public debate within the U.S. about foreign policy, WikiLeaks' releases in 2010 have been called a catalyst for the "Arab Spring"—a series of uprisings against repressive governments in the Middle East. Peter Walker, *Amnesty International hails WikiLeaks and Guardian as Arab spring 'catalysts'*, The Guardian (May 12, 2011), https://www.theguardian.com/world/2011/may/13/amnesty-international-wikileaks-arab-spring.

The U.S. government claimed these leaks posed national security risks, and in 2011, it publicly announced a criminal investigation into Assange and WikiLeaks. *See* Ed Pilkington, *WikiLeaks: US opens grand jury hearing*, The Guardian (May 11, 2011), https://www.theguardian.com/media/2011/may/11/us-opens-wikileaks-grand-jury-hearing. Around that time, the Swedish government issued an unrelated arrest warrant for Assange. *Julian Assange: A timeline*

*of WikiLeaks founder's case*, BBC News (Nov. 19, 2019), https://www.bbc.com/news/world-europe-11949341.  Assange sought and obtained asylum from the Ecuadorian government in its London embassy in June 2012 and remained there until April 11, 2019, when Ecuador withdrew his asylum and he was detained by U.K. authorities.  *See* Emily Dixon et. al., *Police arrest Julian Assange at Ecuadorian Embassy in London*, CNN (Apr. 11, 2019), https://edition.cnn.com/2019/04/11/uk/julian-assange-arrested-gbr-intl/index.html.  The same day that Ecuador withdrew asylum for Assange, the DOJ unsealed an indictment that charged Assange with conspiracy to commit computer intrusion.  *See* Release, U.S. Att'ys Office for the E. Dist. of Va., WikiLeaks Founder Charged in Computer Hacking Conspiracy (Apr. 11, 2019), https://www.justice.gov/usao-edva/pr/wikileaks-founder-charged-computer-hacking-conspiracy.

In superseding indictments, DOJ charged Assange with violating additional criminal statutes, including the Espionage Act.  *See* Release, DOJ, WikiLeaks Founder Julian Assange Charged in 18-Count Superseding Indictment (May 23, 2019), https://www.justice.gov/opa/pr/wikileaks-founder-julian-assange-charged-18-count-superseding-indictment; Release, DOJ, WikiLeaks Founder Charged in Superseding Indictment (June 24, 2020), https://www.justice.gov/opa/pr/wikileaks-founder-charged-superseding-indictment.  The U.S. government's efforts to prosecute Assange under the Espionage Act for the truthful publication of government documents has raised significant questions regarding the scope of the First Amendment, the government's alleged overclassification of records, and whether criminalizing "the receipt and publication of classified information poses a direct threat" to traditional "journalists seeking to publish such information in the public interest."  Natasha Bertrand, *DOJ accuses Assange of violating Espionage Act*, Politico (May 23, 2019),

https://www.politico.com/story/2019/05/23/doj-accuses-assange-of-violating-espionage-act-1342653.

Assange is currently fighting the U.S. government's efforts to extradite him in U.K. courts.  In December 2021, a U.K. appellate court concluded that Assange could be extradited. J.D. Tuccille, *Julian Assange Extradition Decision the Latest Blow to Freedom of the Press*, Reason (Dec. 13, 2021), https://reason.com/2021/12/13/julian-assange-extradition-decision-the-latest-blow-to-freedom-of-the-press/.  Assange appealed the decision to the U.K.'s Supreme Court, but his appeal was recently denied.  Victoria Lindrea, *Julian Assange denied permission to appeal against extradition*, BBC (March 14, 2022), https://www.bbc.com/news/uk-60743322. To date, he remains in the U.K. and is awaiting further legal process for extradition.  *Julian Assange is one major step closer to extradition to the U.S.,* NPR (Apr. 20, 2022), https://www.npr.org/2022/04/20/1093708316/julian-assange-extradition.

**B.      Plaintiff and Her Reporting on Julian Assange and WikiLeaks**

Plaintiff Stefania Maurizi is an Italian investigative journalist currently working for the major Italian daily "Il Fatto Quotidiano."  Compl. ¶ 4.  Maurizi previously worked for the Italian daily "La Repubblica," consistently rated among the top two Italian newspapers, and for the country's leading newsmagazine "l'Espresso."  *Id.*

Maurizi has extensively covered Assange and Wikileaks for more than 10 years.  *See* Compl. ¶ 4.[2]  She reported on many of WikiLeaks's major releases, including the Afghan War Diary and Cablegate.  As part of her investigation into Assange's legal battles from the Ecuadorian embassy and in U.K. courts, she submitted public records requests in both Sweden and the United Kingdom to obtain information.  *See* Ewen MacAskill & Owen Bowcott,

---

[2] *See also* Stefania Maurizi Website: WikiLeaks, https://stefaniamaurizi.it/en-wikileaks.html (collecting coverage).

*Correspondence between CPS and its Swedish counterparts about WikiLeaks founder deleted after lawyer retired in 2014*, The Guardian (Nov. 10, 2017), https://www.theguardian.com/media/2017/nov/10/uk-prosecutors-admit-destroying-key-emails-from-julian-assange-case (discussing Maurizi's freedom of information requests).  She recently published a book on Assange and WikiLeaks entitled "Il potere segreto" (The Secret Power).  *See* Stefania Maurizi, Il potere segreto (Chiarelettere eds., 2021).  She has received numerous awards for her work, including the European Award Investigative and Judicial Journalism for her work on Assange and WikiLeaks.  *Premiata l'inchiesta di Maurizi su Wikileaks*, il Fatto Quotidiano (Nov. 21, 2021), https://www.ilfattoquotidiano.it/in-edicola/articoli/2021/11/21/premiata-linchiesta-di-maurizi-su-wikileaks/.  She is also currently working on an English language version of this book.

## C.     Plaintiff's FOIA Request and State Records Productions

On February 7, 2018, Maurizi submitted a FOIA request to State seeking communications and records concerning Julian Assange created between 2010 and 2012.  Compl. ¶ 3 & Ex. 1 (FOIA request seeking "a copy of the emails, cables, reports, memos from the 1st of July 2010 to the 1st of July 2012 concerning Mr. Julian Assange, the founder of WikiLeaks").   More than two years passed without a substantive response by State, prompting Maurizi to bring this lawsuit in April 2020 to compel State to comply with its FOIA obligations and produce records responsive to her request.  Compl. ¶¶ 19-22.

In August 2020, following a Court-ordered meet and confer, State made its first production and has continued to make rolling productions thereafter at a processing rate of 300

pages per month.  In the February 2022 joint status report, State represented that with the January

production, all responsive, unclassified non-retired records had been produced.  ECF 37.[3]

This amounts to approximately 260 records processed to date, of which State released

seven entirely, withheld four entirely,[4] and released 252 in redacted form.  Of those, most appear

to be discussions within State of press coverage of Wikileaks.  *See, e.g.*, Smith Decl. Exs. 5-6,

10, 14.[5]  Some are "talking points" for State employees providing comment on the Wikileaks

document releases.  *E.g.*, Smith Decl. Ex. 7-9.  State has redacted virtually all of these records on

the grounds that they contain "inter-/intra-agency" communications under FOIA Exemption

(b)(5) and/or "private" information under FOIA Exemption (b)(6).  Because these exemptions do

not properly apply to the decade-old records Plaintiff seeks here, Maurizi now moves for partial

summary judgment, seeking full release of the records, or, at a minimum, *in camera* review by

this Court.[6]

---

[3] State has indicated that, in addition to these "unclassified, non-retired records," it also (1) located "730 pages of relevant retired records" for review, *see* Dec. 2021 Joint Status Report (ECF 35), and (2) must search its classified system for potentially non- or un-classified responsive records that may be there, *see* Declaration of Alia Smith ("Smith Decl.") Ex. 1.  Since December 2021, State has produced a handful of redacted "retired" records and continues to do so on a rolling basis.  State has not yet searched its classified system for responsive records, and has asserted that it has not yet returned to pre-pandemic on-site work, and that FOIA personnel working remotely have limited access to its classified system.  *See* March 2022 Joint Status Report (ECF 38).

[4] In its August 2020 production, State withheld one record, citing Exemption 5.  Smith Decl. Ex. 2.  In its October 2021 production, State withheld two records, citing Exemptions 1 and 6.  Smith Decl. Ex. 3.  In its March 2022 production, State withheld one record, citing Exemptions 6 and 7.  Smith Decl. Ex. 4.

[5] To enable the Court and the parties to easily reference the produced public records, Plaintiff has Bates-stamped the produced records with the prefix SM[number] in chronological order of receipt of the records.  Plaintiff will make all Bates-stamped records available to State and the Court upon request.

[6] This Motion is for "partial" summary judgment because, as noted *supra* at n. 3, State still has not fully processed the "retired" records or those un- or non-classified records that may reside on

## STANDARD OF REVIEW

FOIA requires federal agencies to make agency records promptly available to any member of the public upon request, unless those records fall within one of nine exemptions. 5 U.S.C. § 552(a)(3), (b). A court reviewing a motion for summary judgment in a FOIA case must conduct a *de novo* review of the record. *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008). The agency seeking to withhold a record "bears the burden of proving that an exemption applies." *Bartko v. DOJ*, 898 F. 3d 51, 62 (D.C. Cir. 2018). Underlying this analysis is the principle that FOIA is "a means for citizens to know 'what the Government is up to,'" and represents "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (citation omitted). The exemptions should not "obscure the basic policy that disclosure, not secrecy, is the dominant objective of [FOIA]." *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001).

Accordingly, the exemptions are "narrowly construed," and an agency seeking to withhold a record under an exemption must specifically articulate its reasons for doing so. *Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) ("[C]onclusory and generalized allegations of exemptions are unacceptable."). Each invocation of an exemption must be specifically

---

the classified system. Plaintiff reserves the right to challenge the rate of production of these records or any exemptions State may invoke in connection them. But State's claimed exemptions with respect to the "non-retired" records are ripe for review now, and Plaintiff should not be made to wait additional months, if not years, for State to produce the remaining records in order to obtain relief regarding the documents State *has* reviewed. Plaintiff made her FOIA request more than *two years ago*, and FOIA is meant to provide requestors with *prompt* access to documents. *See* 5 U.S.C. § 552(a)(6)(B)(i) (describing production times in terms of days, not years, or even months); *see also, e.g., Seavey v. DOJ*, 266 F. Supp. 3d 241, 244 (D.D.C. 2017) (documents should be processed "within days or a few weeks" of a response, "not months or years") (citing *CREW v. FEC*, 711 F.3d 180, 189 (D.C. Cir. 2013)); *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) ("unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent [such] abuses") (citing *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)).

justified. *See Judicial Watch, Inc. v. DOJ*, No. 17-0832 (CKK), 2019 U.S. Dist. LEXIS 163473, at *20 (D.D.C. Sept. 24, 2019). If an agency fails to meet its burden, a court has discretion to conduct an *in camera* review in FOIA cases "if the court believes it is needed to make a responsible de novo determination on the claims of exception." *Larson v. Dep't of State*, 565 F.3d 857, 869-70 (D.C. Cir. 2009) (internal quotations omitted).

Moreover, in 2016, Congress passed the FOIA Improvement Act, which places an additional burden on agencies when withholding information subject to discretionary exemptions, such as Exemptions 5 and 6, which State invokes here. *See Pinson v. DOJ*, 236 F. Supp. 3d 338, 359 (D.D.C. 2017). The Act provides that an agency may only withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information." *Reporters Comm.*, 3 F.4th at 369 (internal marks omitted); *see also* S. Rep. No. 114-4, at 8 (2015) (same). Rather, the "foreseeable harm" requirement "imposes an independent and meaningful burden on agencies" to "concretely explain how disclosure 'would' – not 'could' – adversely impair" an interest the exemption protects. *Reporters Comm.*, 3 F.4th at 369-70 (internal marks omitted).

Here, State has not, and cannot, meet its burden of demonstrating that the redacted and withheld information is subject to the claimed exemptions or that concrete harm would result from disclosure of the withheld information.

**ARGUMENT**

I.    **STATE HAS NOT AND CANNOT SHOW THAT THE INFORMATION WITHHELD IS PROPERLY EXEMPT FROM DISCLOSURE UNDER EXEMPTION 5**

Exemption 5 permits withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Congress intended Exemption 5 to be "as narrow as is consistent with efficient Government operation." *FTC v. Grolier, Inc.*, 462 U.S. 19, 23 (1983) (internal marks omitted); *see also Klamath*, 532 U.S. at 9 (the "point" of Exemption 5 "is not to protect Government secrecy pure and simple"). As relevant here, this exemption includes the so-called "deliberative process privilege," which shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* at 8.

To invoke this privilege, and, by extension, Exemption 5, the defendant agency must (1) establish that the material at issue is both "predecisional and deliberative," meaning that it was "generated before the adoption of an agency policy" and "reflects the give-and-take of the consultative process," *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), and (2) "concretely explain" the "foreseeable harm" that would result from the disclosure of such information, *see Reporters Comm.*, 3 F.4th at 369-70.[7]

A.    **State Has Not Shown, and Cannot Show, that All the Withheld Information Is Predecisional and Deliberative.**

It is well settled that "agency communications containing purely factual material are generally not protected by" the inter-agency exemption. *Russell v. Dep't of Air Force*, 682 F.2d

---

[7] Although Exemption 5 may also cover records protected by the attorney-client privilege and other litigation privileges, Plaintiff understands State here to be relying only upon the deliberative process privilege.

1045, 1048 (D.C. Cir. 1982).  Thus, "Exemption 5 disputes can often be resolved by the simple

test that factual material must be disclosed but advice and recommendations may [in some

circumstances] be withheld."  *Wolfe v. Dep't of Health & Human Servs*., 839 F.2d 768, 774

(D.C. Cir. 1988).  Moreover, "a report does not become a part of the deliberative process merely

because it contains only those facts which the person making the report thinks material,"

therefore the general rule is that "compilations of facts, devoid of any conclusions,

recommendations, opinions or advice" cannot be withheld.  *Playboy Enters. Inc. v. DOJ*, 677

F.2d 931, 935-36 (D.C. Cir. 1982).

   The privilege also does not apply to records reflecting final agency determinations.

*Judicial Watch, Inc. v. Dep't of State*, 349 F. Supp. 3d 1, 10 (D.D.C. 2018).  And although drafts

may sometimes be exempt from disclosure, interim documents are not categorically privileged.

"Even if a document is a 'draft of what will become a final document,' the court must also

ascertain 'whether the document is deliberative in nature.'"  *Arthur Andersen & Co. v. IRS*, 679

F.2d 254, 257-58 (D.C. Cir. 1982) (quoting *Coastal States*, 617 F.2d at 866); *see also Judicial

Watch, Inc. v. DOJ*, 20 F.4th 49, 55-57 (D.C. Cir. 2021) (citing multiple cases making clear that

"drafts are not automatically exempt under the deliberative process privilege," and explaining the

agency bears the burden of providing  "the 'who,' 'what,' 'where,' and 'how' of the deliberative

process and the role played by the withheld material").  In fact, just this past year, the D.C.

Circuit ordered release of PowerPoints that "simply describe already-made and in-place policy

choices," finding that "the government ha[d] failed to identify any deliberative component to the

draft PowerPoints." *Reporters Comm. v. FBI*, 3 F.4th at 367.  Suggested factual revisions to a

draft report were also ordered released on grounds that they were not deliberative in nature. *Id.* at

365.

Although it is necessarily difficult for Plaintiff to have a good sense what has been redacted, it appears from context that much of the redacted information is either "factual" in nature, "final" in nature, or both.  That is, such information is not the type of "deliberative" information that Exemption 5 is meant to protect, which is "to prevent injury to the quality of agency decisions."  *Judicial Watch, Inc. v. Dep't of the Treasury*, 802 F. Supp. 2d 185, 195 (D.D.C. 2011) (citation omitted).

For example:

- In one email chain, someone (presumably a State employee) sends an email with inline comments to a February 2011 Australian news article reporting that the U.S. Ambassador to Australia denied that the U.S. was taking any legal action against Assange for the leaks.  *See* Smith Decl. Ex. 10.  State also redacted most of the back and forth between National Security Advisor Jacob D. Sullivan and unknown individuals that followed.  *Id.*  There is no indication this was part of an agency decision-making process; rather, it reflects discussion about public response to and coverage of the leaks.

- In a February 9, 2011 email from an individual whose name is redacted to State employees referring to an "attached Q&A and a one-page fact sheet for the Internet freedom speech."  The attachments are redacted in full, and almost all the response emails are redacted on (b)(5) grounds.  Smith Decl. Ex. 11.  The end of the record states it was "approved" by Michael Posner, Assistant Secretary of State for Democracy, Human Rights, and Labor.  This record is self-described as "factual", and a high-ranking State appointee signed off on the attached documents, indicating it is a final, non-deliberative document.

- The content of emails in another email chain with the subject "IF Speech-Intl Reaction Concerns/Proposed Responses"—presumably on the same topic—is also fully redacted, and one page (which appears to be the "Q&A" and "one-page fact sheet") is fully withheld.  Smith Decl. Ex. 12.

- A November 29, 2010 email to former White House Counsel Cheryl D. Mills (the sender's name is redacted) refers to and attaches a document titled "Background_Wikileaks.docx," and the entirety of the attachment and a portion of the email correspondence are redacted. Smith Decl. Ex. 13.  This presumably is a factual description of Wikileaks and subject to FOIA disclosure requirements.

- The content of an undated document reflecting "Wikileaks General Guidance," which at the end indicates it was "cleared" by a number of individuals whose identities are redacted, is fully withheld.  Smith Decl. Ex. 8 at SM0000248.  Moreover, the record indicates it was "approved" by Jim Loi, the Chief of Staff

12

and Deputy Assistant Secretary for East Asian & Pacific Affairs, indicating that this was not a deliberative document but rather settled guidance approved by a senior State official. *Id.*

- Likewise, a record titled "Press Questions and Answers" that was "approved" by Loi and "cleared" by many others is virtually fully redacted. Smith Decl. Ex. 7 at SM0000245. This too reflects decided guidance for responses to press inquiries.[8]

State bears the burden of demonstrating Exemption 5 was properly applied in each instance of withholding. These records—and likely many others with even less context available—were not "generated before the adoption of an agency policy." *Coastal States*, 617 F.2d at 854. Rather, they appear to "simply describe already-made and in-place policy choices." *Reporters Comm.*, 3 F.4th at 367. As such, State cannot invoke Exemption 5 to withhold information in these records.

## B.  State Has Not and Cannot Articulate a Reasonably Foreseeable Harm to Interests Protected by Exemption 5.

As noted *supra* at 9, Congress enacted the FOIA Improvement Act in 2016, imposing on agencies the additional "independent and meaningful" burden of showing that release of the requested records under a discretionary exemption would pose reasonably "foreseeable harm" to the agency. *Reporters Comm.*, 3 F.4th at 369 (internal quotations and alterations omitted); *see also Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) ("[A]n agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest[.]"). Enactment was "based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to

---

[8] The bulleted list is just a sample of the Exemption 5 withholdings that appear the most egregious based on the disclosed context. Plaintiff cannot know precisely what information has been withheld, but State bears the burden of establishing Exemption 5 applies in each instance. In the event that State does not specify why Exemption 5 entitles it to withholding as to all redactions, Plaintiff respectfully requests that the Court conduct in camera review on the productions to date. *Larson*, 565 F.3d at 870.

withhold any information that might technically fit.'" *Id.* at 100 (quoting 162 Cong. Rec. H3714-01, H3717162 (2016) (noting that although some agencies "have made an effort to comply with the letter of the law, very few have complied with the spirit of the law")). In fact, "Congress was especially concerned about agencies' [over-]reliance on Exemption 5 and the deliberative process privilege." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019) (denying the government's withholdings for failing to meet the increased burden under Exemption 5).

To carry its burden under this new "foreseeable harm" requirement, agencies, including State here, must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." *Id.* at 106 (internal marks omitted). Agencies cannot satisfy the foreseeable harm standard with "boiler plate language." *Id.* Thus, merely "mouthing the generic rationale for the deliberative process privilege itself" is not sufficient. *See Reporters Comm.*, 3 F.4th at 370; *see also Reporters Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, No. 1:18-cv-00155 (TNM), 2021 U.S. Dist. LEXIS 200240, at *20 (D.D.C. Oct. 18, 2021) (agencies must explain foreseeable harm "beyond the 'generic and nebulous' discomfort of employees").

      **1.**    **Discussions of News Articles, Press Inquiries, and Public-Facing Talking Points Are Particularly Unlikely to Present a Foreseeable Harm if Disclosed**

Many of the records State has redacted appear to be internal discussions of news items and press inquiries related to Assange. *See, e.g.*, Smith Decl. Exs. 14 (article regarding Assange's potential release of certain tax information); 15 (discussion of Radio Free Europe blog post regarding internet freedom and Assange); 5 (discussions of Human Rights Watch press release on prosecuting Assange); 16 (60 Minutes inquiry); 17 (Guardian request for interview);

18 (discussion of AP inquiry); 19 (AP inquiry); 20 (inquiry from Time reporter).  Similarly, others of the records are talking points and "Q&A fact sheets" for public facing events, such as an "Internet Freedom" speech given by the Secretary.  Smith Decl. Ex. 11 (fact sheet for Internet Freedom speech); 21 (Q&A presumably regarding Afghan War Logs leak).  Even if these records are "non-final" and "deliberative," it is difficult to see how what "harm" their disclosure would supposedly cause.

In 1993, then-Attorney General Janet Reno issued a memorandum announcing the Department of Justice's policy to only defend the exertion of FOIA exemptions where a foreseeable harm existed from disclosure.  *See* Attorney General Reno's FOIA Memorandum, FOIA Update Vol. XIV, No. 3 (1993), https://www.justice.gov/oip/blog/foia-update-attorney-general-renos-foia-memorandum.  The Department of Justice's Office of Information Policy (the "OIP") subsequently identified several factors for determining whether a foreseeable harm existed in the Exemption 5 context, including: (1) the nature of the decision involved; (2) the nature of the decision making process; (3) the status of the decision; (4) the status of the personnel involved; (5) the potential for process impairment; (6) the significance of any process impairment; (7) the age of the information; and (8) the sensitivity of individual record portions.  *See* Office of Information Policy, U.S. Dep't of Justice, FOIA Update: OIP Guidance: Applying the 'Foreseeable Harm' Standard Under Exemption 5, FOIA Update Vol. XV, No. 2 (1994), https://www.justice.gov/oip/blog/foia-update-oip-guidance-applying-forseeable-harm-standard-under-exemption-five (hereinafter "1994 FOIA Update").  The FOIA Improvement Act clarified and codified this guidance.  *See* S. Rep. No. 114-4, at 3.  Though not dispositive, the OIP's factors remain helpful in analyzing the potential for foreseeable harm.  *See Rosenberg v. DOD*, 442 F. Supp. 3d 240, 260 n.7 (D.D.C. 2020) (explaining that "depending on the circumstances,

some or all" of the OIP factors "may be relevant" in determining foreseeable harm).  And the

OIP's factors favor disclosure of the discussions of news articles, press inquiries, and public-

facing talking points at issue here.

First, as to the nature of the decision and decision-making process, the "decisions" at

issue in these talking points hardly involve the type of substantive policy decisions the

deliberative process was meant to protect.  *See Petroleum Info. Corp. v. DOI*, 976 F.2d 1429,

1436 n.8 (1992) ("To be protected under Exemption 5, the kind and scope of discretion involved

must be of such significance that disclosure genuinely could be thought likely to diminish the

candor of agency deliberations in the future."); *see also Fox News Network, LLC v. Dep't of*

*Treasury*, 739 F. Supp. 2d 515, 545 (S.D.N.Y. 2010) ("Communications regarding how to

present agency policies to Congress, the press, or the public, while deliberative, typically do not

relate to the type of substantive policy decisions Congress intended to enhance through frank

discussion.").  Discussions of news articles and the like are a common occurrence at federal

agencies and are not ordinarily part of substantive or major policy actions.  For such "mundane,

quotidian matters," State must provide "more explanation" to satisfy the foreseeable harm

requirement.  *See Rosenberg*, 442 F. Supp. 3d at 259.

Second, as to the status of the decision and the personnel involved, most of the decisions

that may be reflected in the discussions of responding to press inquiries and the like have long

since been made, and the specific personnel involved were from two administrations ago.  As the

OIP has explained, disclosure of deliberations prior to final decisions being made "may lead to

pressures upon or harassment" of the decision makers.  *See* Office of Information Policy, U.S.

Dep't of Justice, FOIA Update: Policy Guidance: When to Assert the Deliberative Process

Privilege Under FOIA Exemption Five, FOIA Update, Vol I, No. 1 (1979),

https://www.justice.gov/oip/blog/foia-update-policy-guidance-when-assert-deliberative-privilege-under-foia-exemption-five (hereinafter "1979 FOIA Update").  However, there is "far less likelihood" of harm in disclosure of information about the decision making process for decisions that have already been made.  1994 FOIA Update.  Here, the decisions of whether to respond to the news inquiries in question, and the decisions of whether and which talking points to give at public events, have long since been made.

Third, there is little likelihood of significant process impairment given the nature of the decisions at issue here.  OIP Guidance notes that, "[i]n some cases, any anticipated 'chilling effect' [of disclosure] on the agency's decisionmaking process might be so minimal as to be practically negligible."  *See* 1994 FOIA Update.  Deliberations relating to news requests and talking points would likely fall into this category, because advice on whether to respond to a reporter or how to word a talking point is unlikely to change simply because it will later be disclosed after the final talking point or news article has become public.

Fourth, the age of the records weighs against a finding of "foreseeable harm."  The records withheld and redacted here are, by now, a decade old.  In enacting the FOIA Improvement Act, Congress recognized that records become less sensitive over time, and thus the passage of time weighs in favor of disclosure under the "foreseeable harm" analysis.  *See* S. Rep. No. 114-4, at 8 (explaining factors to consider include "age, content, and character" of a record). Indeed, the Act incorporated a sunset provision into Exemption 5, categorically blocking its application to all "records created 25 years or more before the date on which the records were requested."  5 U.S.C. § 552(b)(5).  Although the records at issue here are not yet subject to automatic disclosure under the sunset provision, the fact that they are 10 years old is strong evidence that whatever "harm" from disclosure may once have existed no longer does.

17

Finally, there is nothing particularly "sensitive" about these records. Certain records are "obviously sensitive" in that they reflect deliberations that if disclosed, clearly present a foreseeable harm to those processes. *See Rosenberg*, 442 F. Supp. 3d at 259. For example, in *Reporters Committee v. FBI*, the D.C. Circuit explained that for emails between the FBI director and other high-ranking officials "about how to respond to an ongoing crisis that threatened existing covert Bureau operational tactics," the context and purpose of those communications made the "foreseeability of harm manifest." 3 F.4th at 372. In contrast, the records here do not appear to be "obviously sensitive." *See Rosenberg*, 442 F. Supp. 3d at 259. Many redacted records seem to primarily relate to whether to respond to news articles about well-known public events relating to WikiLeaks and Assange, as well as discussions about talking points for public-facing events. Although the records at issue are heavily redacted, the unredacted portions do not appear to involve deliberations about critical operational functions like covert operations. For example, one email chain appears to involve a discussion of how to respond to an AP inquiry asking State to confirm whether it was true that a tranche of unredacted cables from State was out, and whether State was "cooperating" with WikiLeaks. *See* Smith Decl. Ex. 18 at SM0000281. Such yes/no questions do not facially require obviously sensitive policy discussions. In light of the nature of the decision-making process here, without more, it is difficult to see how a substantial likelihood of process impairment exists.

## C.    Foreseeable Harm Is Not Apparent from Other Withheld and Over-Redacted Records

State also has not sufficiently identified a foreseeable harm for certain records that it has produced in substantially redacted form or for the record it has withheld in its entirety on Exemption 5 grounds. *See* Smith Decl. Ex. 2. For the substantially redacted records, the

redactions are such that foreseeable harm is difficult to evaluate because it is unclear what role, if any, the redacted records played in the deliberative process.  For example:

- One email appears to be updating the Secretary on WikiLeaks, but it is almost entirely redacted.  Smith Decl. Ex. 22.

- Another email chain appears to be a discussion about WikiLeaks, but it is also almost entirely redacted.  Smith Decl. Ex. 23.

- One email is labeled as a "memo" from a redacted source regarding "Background" on WikiLeaks that is entirely redacted.  Smith Decl. Ex. 13.

- Another email chain redacts certain notes on a call with Assange.  Smith Decl. Ex. 24.

Without more, it is difficult to understand whether these records had any role in the deliberative process, much less that disclosure of these records would present a foreseeable harm.

To meet its burden, State must "concretely explain" how disclosure of these records would adversely impair internal deliberations.  *See Reporters Comm.*, 3 F.4th at 369.  State's cover letters to its productions do not contain any such explanation.  For example, in its cover letter to the January 2021 production, State includes a paragraph stating that an enclosure "explains the FOIA exemptions."  Smith Decl. Ex. 25.  The enclosure is a boilerplate list of all FOIA exemptions without regard to which exemptions were actually invoked in the production and cursorily states that "[a]ll non-exempt material that is reasonably segregable from the exempt material has been released and is enclosed."  *See id*.  Similarly, for the record State has withheld entirely on Exemption 5 grounds, it has not described in any way what the record is or how it relates to the deliberative process.  In its cover letter to the August 2020 production, State conclusorily asserts: "The record withheld in full is exempt from release pursuant to FOIA Exemption 5."  Smith Decl. Ex. 2.  This is insufficient to carry State's burden of explaining the foreseeable harm that would result from disclosure.  *See Reporters Comm.*, 3 F.4th at 369.  *In camera* review is particularly appropriate under these circumstances.  *See New York Times Co. v.*

19

*DOJ*, 19 Civ. 1424 (KPF), 2021 U.S. Dist. LEXIS 20776, at *17 (S.D.N.Y. Feb. 3, 2021) ("*In camera* review of agency documents in dispute in FOIA actions is appropriate where, for example, (i) 'the record is vague or the agency claims too sweeping[.]'").

## II.    STATE HAS NOT, AND CANNOT, MEET ITS BURDEN OF SHOWING THAT THE NAMES OF PUBLIC SERVANTS ARE "PRIVATE" PURSUANT TO EXEMPTION 6

In the emails and other communications it has produced, most of which concern public reaction to the 2010 document leaks, State has redacted the names of virtually all State employees on the grounds that these names, by themselves, constitute "private" information under Exemption 6.  For example, the identities of the "drafters" of a number of records labeled "guidance" or "talking points" have been redacted, as well as the identities of those who "cleared" the guidance.  Smith Decl. Exs. 7, 8, 26.  This is a gross overapplication of FOIA's privacy exemption.

Exemption 6 shields "personnel and medical files and similar files" where their disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  To properly invoke this exemption, agencies must demonstrate "'disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest.'"  *Am. Immigr. Lawyers Ass'n v. Exec. Off. For Immigr. Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)); *see also Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (describing balancing analysis required for Exemption 6).  Here, Government officials do not have a measurable *personal* privacy interest in connection with being identified in communications made in their *official* duties, and, even if a minimal privacy interest did exist, it is outweighed by the public interest in disclosure:

**No Serious Privacy Interest:**  As an initial matter, government employees generally have a "diminishe[d] … privacy interests" in connection with their work as public servants. *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984).  Thus, while, for example, their home addresses may be considered "private" under FOIA, there is nothing inherently "private" about their names alone.  *See, e.g.*, *COMPTEL v. FCC,* 910 F. Supp. 2d 100, 124 (D.D.C. 2012) ("[I]nformation that 'merely identifies the names of government officials who authored documents and received documents' does not generally fall within Exemption 6"); *Friedman v. United States Secret Serv.*, 923 F. Supp. 2d 262, 282 (D.D.C. 2013) ("the names of government employees and servicemembers and their work telephone number" were not "similar files" to personnel or medical records and not exempt).  *See also, e.g., Calderon v. USDA,* 236 F. Supp. 3d 96, 120 (D.D.C. 2017) (finding "no privacy interest in" even in the names of *non-governmental* employees and granting plaintiff summary judgment on this issue).

**Public Interest in Disclosure:**  The "'core purpose of the FOIA" is to facilitate the "public understanding of the operations or activities of the government.'" *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 282 (D.C. Cir. 1997) (quoting *DOD v. FLRA*, 510 U.S. 487, 495 (1994)). Identifying public officials and employees in their work-related communications serves just such a purpose.  *Stern*, 737 F.2d at 92 (there is a "public interest in knowing how public employees are performing their jobs").  These records reflect State's reaction to Wikileaks publications when the leaks were a topic of conversation both in the U.S. and abroad, and State was frequently making public statements.  There is a public interest in knowing which State employees aided in crafting these responses and otherwise were analyzing the news reporting on the leaks.

**<u>No Foreseeable Harm</u>**:  As with Exemption 5, to properly invoke Exemption 6, State must meet the "heightened standard" of foreseeable harm resulting from release of the records. *See Judicial Watch, Inc.*, 375 F. Supp. 3d at 100; *see also Louise Trauma Ctr. LLC v. Dep't of Homeland Sec.*, No. 1:20-cv-01128 (TNM), 2022 U.S. Dist. LEXIS 66691, at *17-18 (D.D.C. Apr. 11, 2022) (applying foreseeable harm standard to Exemption 6).  No foreseeable harm would result from mere names of public employees performing work in their official capacities. Rather, it would increase public understanding of State's handling of Wikileaks' revelations that have had a lasting impact on public trust in the government, and which are now again a topic of conversation as proceedings related to Assange's extradition are underway.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, Plaintiff respectfully requests that this Court enter partial summary judgment in her favor, and enter an Order directing State to release all records and redacted information improperly withheld under Exemptions 5 and 6 and to conform any withholdings or redactions in future productions to the requirements of these exemptions as set forth in the Court's Order.

Dated: May 30, 2022                                   Respectfully submitted,

                                                                          *s/ Alia L. Smith*
                                                                          Alia L. Smith, D.C. Bar #992629
                                                                          Lauren P. Russell, D.C. Bar #1697195
                                                                          BALLARD SPAHR LLP
                                                                          1909 K Street, N.W., 12th Floor
                                                                          Washington, DC 20006
                                                                          (202) 661-2200
                                                                          (202) 661-7605
                                                                          smithalia@ballardspahr.com
                                                                          russelll@ballardspahr.com

                                                                          *Counsel for Plaintiff*